# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PR ACQUISITIONS, LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0465-TMR |
| | ) | |
| MIDLAND FUNDING LLC, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff/Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OPERATING PARTNERS CO., LLC, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 23, 2018
Date Decided: April 30, 2018

Garvan F. McDaniel and Daniel K. Hogan, HOGAN MCDANIEL, Wilmington, Delaware; Eric D. Herschmann, Michael P. Bowen, and Olga Lucia Fuentes Skinner, KASOWITZ BENSON TORRES LLP, New York, New York; *Attorneys for Plaintiff/Counterclaim Defendant PR Acquisitions, LLC and Third-Party Defendant Operating Partners Co., LLC.*

Matthew F. Boyer, Ryan P. Newell, and Mary I. Akhimien, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; Alan F. Kaufman and Joseph G. Silver, HINSHAW & CULBERTSON LLP, New York, New York; *Attorneys for Defendant/Counterclaim Plaintiff/Third-Party Plaintiff Midland Funding, LLC.*

**MONTGOMERY-REEVES, Vice Chancellor.**

In this action, a seller of consumer debt accounts alleges that a buyer's failure to release escrow funds to seller violates the parties' purchase agreement. Seller moves for summary judgment asserting that buyer did not comply with the notice provisions of a contemporaneously executed escrow agreement, that any claims against the escrow are untimely, and that the escrow funds therefore should be released. Buyer cross-moves for partial summary judgment arguing that it provided actual notice to seller by sending a letter to the escrow agent, which seller learned of before the notice deadline expired.

Buyer also asserts counterclaims for fraud, negligent misrepresentation, breach of contract, indemnification, and unjust enrichment against seller. Buyer asserts the same claims and an aiding and abetting fraud claim against a servicer to the purchased accounts, which was party to a contemporaneously executed servicing agreement. Buyer alleges that seller and servicer fraudulently induced buyer to agree to the sale by not disclosing changes to collection practices and misrepresenting the value of the purchased accounts in documents and communications, causing buyer in excess of $6 million in damages. Buyer also alleges that seller and servicer owe buyer an additional $350,000 for failing to remit payments and pay adjustments for repurchases of certain purchased accounts under the relevant agreements. Seller and servicer move to dismiss buyer's counterclaims and third-party claims. Seller contends that buyer's fraud and misrepresentation

1

allegations lack the requisite particularity, that buyer's indemnification right has expired, and that buyer's failure to comply with the notice provisions of the purchase and escrow agreements bars its breach of contract claims. Servicer contends it is not bound by the terms of the purchase and escrow agreements and that buyer fails to identify any actions by servicer related to buyer's counterclaims or third-party claims.

Buyer also moves to amend its complaint to bolster its claims against seller and servicer.

For the reasons discussed herein, I conclude that buyer fails to state a claim for fraud and negligent misrepresentation because certain of buyer's allegations lack the requisite particularity and because buyer admits that it possessed data that would have allowed it to discern the remaining purported misrepresentations. The breach of contract and indemnification claims fail because buyer did not give the notice required by the purchase and escrow agreements. Buyer's unjust enrichment claims are dismissed as duplicative. Buyer also fails to state claims against servicer. Buyer's fraud and negligent misrepresentation claims against servicer fail for the same reasons buyer's fraud and negligent misrepresentation claims against seller fail, and because buyer does not identify any specific acts of servicer in furthering seller's purported fraud. Buyer's aiding and abetting fraud claim also fails because buyer does not adequately allege any underlying tortious conduct. Buyer's breach

of contract claims against servicer fail because servicer is not a party to the purchase or escrow agreements and buyer alleges no facts whatsoever relating to a purported breach of the servicing agreement. Buyer's indemnification claim against servicer fail because buyer does not allege conditions requiring indemnification under the servicing agreement, and buyer's unjust enrichment claim against servicer is duplicative. Finally, I conclude that buyer's proposed amendments to its counterclaims and third-party claims are futile because the amendments would not change the Court's analysis of the claims. Therefore, I grant seller's Motion for Summary Judgment to release the escrow funds, deny buyer's Motion for Partial Summary Judgment to hold the escrow funds, grant seller and servicer's Motion to Dismiss buyer's counterclaims and third-party claims, and deny buyer's Motion to Amend.

## I. BACKGROUND

For purposes of the Motion for Summary Judgment, the facts are drawn from the pleadings and the evidence submitted by the parties.[1] For purposes of the Motion to Dismiss, the facts are drawn from Defendant's Amended Counterclaims and Third-Party Complaint and the documents incorporated by reference therein.[2]

---

[1] *See* Ct. Ch. R. 56(c).

[2] On a motion to dismiss under Rule 12(b)(6), the Court may consider a document outside the pleadings if "the document is integral to a plaintiff's claim and incorporated into the complaint" or "the document is not being relied upon to prove the truth of its contents." *Vanderbilt Income & Growth Assocs., L.L.C. v.*

3

## A. Parties

Plaintiff PR Acquisitions, LLC ("PRA") is a Nevada limited liability company that holds a number of consumer debt accounts in Puerto Rico.[3] Third-Party Defendant Operating Partners Co., LLC ("OPC") is an affiliate of PRA that serviced the purchased accounts,[4] but it has since been replaced as servicer by Midland Credit Management, Inc. ("MCM"), an affiliate of Defendant Midland Funding LLC ("Midland").[5] Midland is one of the nation's largest buyers of unpaid debt.[6]

## B. Facts

PRA first approached Midland about a possible sale of PRA's debt accounts sometime in 2013 and, later that year, the parties entered into discussions.[7] The accounts consist of "auto loans, charged-off consumer receivables, and charged-off credit card accounts owned by [PRA]" and include, among other things, the right to

---

*Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995)); *see Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013).

3    Pl. & Third-Party Def.'s Mot. to Expedite 6.

4    Def.'s Am. Countercls. & Third-Party Compl. ¶ 25.

5    *Id.* ¶ 24.

6    Pl.'s Verified Compl. ¶ 2.

7    *Id.*; Def.'s Am. Countercls. & Third-Party Compl. ¶ 28.

collect "in any litigation or bankruptcy[.]"[8]  On November 18, 2013, PRA sent

Midland an offering memorandum (the "Offering Memorandum")[9] regarding the

potential sale, which expressly disclaimed the "accuracy or completeness" of the

information therein.[10]

Due diligence occurred in the "first and second quarters of 2014, with many

of the meetings and other interactions concentrated in March, April and May of

2014."[11]  During this time, Midland employees "spent months conducting multiple

due-diligence sessions at [PRA and OPC's] offices in Puerto Rico."[12]  "Representing

[PRA and OPC] at these meetings were, among others, owners Nicolas Kogan and

Rodolfo Sanchez-Colberg, and employees Alejandro Uriarte and Maribel Ortiz-

Castro."[13]  PRA and OPC provided data to Midland and "made numerous other

representations, including written statements in the form of offering memoranda,

emails and other deal-related documents, and oral statements during in-person and

---

[8]     Purchase Agreement § 1.3.

[9]     Pl. & Third-Party Def.'s Mot. to Dismiss Ex. 7.

[10]    Offering Memorandum 1.

[11]    Def.'s Am. Countercls. & Third-Party Compl. ¶ 2.

[12]    *Id.*

[13]    *Id.*  It is unclear from Midland's filings whether these individuals are owners and
        employees of PRA or OPC.

5

telephone conversations."[14] Among this data were "liquidation curves" purportedly showing the "liquidation rates" of the part of the purchased accounts that were "in the legal channel."[15] Midland reviewed the diligence provided and did not raise any objections at the time.[16]

On May 30, 2014, PRA sold the debt accounts to Midland pursuant to a purchase agreement (the "Purchase Agreement")[17] and an escrow agreement (the "Escrow Agreement").[18] On that same day, MCM and OPC entered into an account servicing agreement (the "Servicing Agreement"),[19] which provides that OPC service the purchased accounts under the auspices of MCM.[20] Several provisions of these agreements are relevant to the pending motions.

---

[14]    *Id.* ¶ 3.

[15]    *Id.* ¶¶ 4, 7.

[16]    Pl.'s Verified Compl. ¶ 16. Midland made certain representations and warranties in the Purchase Agreement, including that "(i) it is a sophisticated purchaser of consumer charged-off accounts and has the expertise to evaluate the risks and merits of the transaction . . .; (ii) in making its decision to purchase . . . it made an independent investigation of them; and (iii) the information provided by PRA to Midland was adequate and a sufficient basis on which to determine to acquire, as it did, the Accounts." *Id.* ¶ 15; Purchase Agreement § 6.1.

[17]    Pl. & Third-Party Def.'s Mot. to Dismiss Ex. 1.

[18]    *Id.* at Ex. 2.

[19]    *Id.* at Ex. 6.

[20]    Servicing Agreement § 2. OPC was later terminated as servicer. Def.'s Am. Countercls. & Third-Party Compl. ¶ 45.

6

The Purchase Agreement provides in Section 8.2 that PRA shall indemnify Midland "from and against any and all liability and losses" Midland may suffer "as a result of . . . the inaccuracy of any of [PRA's] representations and warranties contained in this Agreement . . . the breach of any of [PRA's] covenants contained in this Agreement . . . [or] the origination, servicing, maintenance or administration of the Accounts prior to the Closing Date[.]"[21] "The obligations of [PRA] under this Section 8.2 shall survive until [May 30, 2017]."[22] Midland provided no written request to PRA for indemnification under Section 8 before May 30, 2017.[23]

The Purchase Agreement requires in Section 5.1 that PRA repurchase "Ineligible Accounts"[24] within 180 days after May 30, 2014.[25] "[Midland] shall notify [PRA] of each Purchased Account which [Midland] seeks to have [PRA] repurchase in a mutually agreed upon format accompanied by the following applicable documentary evidence in support of [Midland's] Ineligibility Determination."[26] The Purchase Agreement then lists acceptable forms of

---

[21]     Purchase Agreement § 8.2(a).

[22]     *Id.* § 8.2(b).

[23]     *See* Pl.'s Mot. for Summ. J. & Pl. & Third-Party Def.'s Mot. to Dismiss Ex. 3.

[24]     Purchase Agreement § 1.24.

[25]     *Id.* § 5.1.

[26]     *Id.*

7

documentary evidence: (1) a copy of "[PRA] letter verifying action[,]" "canceled, final check[,]" "[PRA] provided 1099[,]" or "other evidence as mutually agreed" verifying a settlement with an account holder; (2) a case number or court papers verifying the bankruptcy of an account holder; (3) "police report or an FTC executed affidavit" verifying fraud; or (4) "[d]eath certificate or satisfactory evidence from an approved third party service" verifying a deceased account holder.[27]  PRA must pay the "Adjustment Amount for each Purchased Account being repurchased to [Midland] not later than thirty (30) days after [Midland] provides reasonable evidence to [PRA] in support of [Midland's] determination that the Purchased Accounts in question are Ineligible Accounts[.]"[28]

In addition, Section 12 of the Purchase Agreement provides the following requirements for notice under any provision of that agreement:

> Any and all notices, consents or other communications required or permitted under this Agreement shall be in writing and shall be delivered by either (a) Federal Express or similar nationally recognized overnight carrier; or (b) certified U.S. mail, postage prepaid and return receipt requested; and addressed as indicated below or otherwise indicated by the parties in writing.[29]

---

[27]    *Id*. § 5.2.

[28]    *Id*. § 5.1.

[29]    *Id*. § 12.

The Purchase Agreement then lists an address for Midland to send notice to PRA.[30]

Midland provided no written request or documentary evidence to PRA for repurchase of "Ineligible Accounts" under Section 5.1 before November 26, 2014, 180 days after May 30, 2014.

The Purchase Agreement also requires in Section 2.6.1 that PRA "forward to [Midland] all funds received by [PRA] with respect to the Purchased Accounts . . . following the Closing Date."[31] PRA also made certain representations in Sections 7.5, 7.12, 7.13 and 7.14 of the Purchase Agreement as to the accuracy of the diligence provided and the character of the purchased accounts, including that the purchased accounts were bought, sold, and maintained in compliance with "Applicable Laws."[32]

The Purchase Agreement then provides that "[PRA's] total liability" and "[Midland's] exclusive remedy with respect to th[e] [Purchase] Agreement, any provision hereof, or the transactions contemplated herein (including, without limitation, with respect to repurchase of ineligible accounts, indemnification of [Midland] . . . and any other obligations of [PRA] pursuant thereto) is limited to the

---

[30]     *Id.*

[31]     *Id.* § 2.6.1.

[32]     *Id.* §§ 7.5, 7.12-14.

9

amount held in escrow . . . pursuant to the Escrow Agreement[.]"[33]  The Escrow Agreement requires that $6 million be held in escrow for the satisfaction of any claims related to the Purchase Agreement,[34] provides the terms for reduction of the escrow funds, and requires that Midland provide PRA with notice of each claim it has against the escrow funds.[35]  To establish a timely claim, Midland must "provide written notice of each Pending Claim and each Anticipated Claim . . . to the Escrow Agent and to [PRA] prior to [May 31, 2017]."[36]  The Escrow Agreement states the following requirements for notice:

> All notices or other communications hereunder shall be deemed to have been duly given and made if in writing and if served by personal delivery upon the party for whom it is intended, if delivered by registered or certified mail, return receipt requested, or by a national courier service, or if sent by facsimile, provided, however, that the facsimile is promptly followed by telephone confirmation thereof to the appropriate person at the address set forth below, or at such other address as may be designated in writing hereafter, in the same manner, by such person.[37]

---

[33]  *Id*. § 10. This limitation of liability provision provides that "[Midland's] obligations under Section 8.2(c)" are excluded, but neither party argues that any of the claims arise from Section 8.2(c). *Id*.

[34]  Escrow Agreement § 1.1.

[35]  *Id*. § 1.3.

[36]  *Id*.

[37]  *Id*. § 4.7.

10

The Escrow Agreement then gives PRA's address.[38] In the absence of a timely claim by Midland, the escrow agent must release the escrow funds "together with any interest, dividends and any other income earned thereon" to PRA on May 31, 2017.[39]

Also on May 30, 2014, OPC and MCM entered in the Servicing Agreement. Several provisions of this agreement are relevant to Midland's third-party claims against OPC. The Servicing Agreement provides in Section 3.2 that OPC shall "remit and account for all Net Proceeds to MCM in a mutually agreeable format and timeframe" and that OPC shall deposit all "Net Proceeds" by "the end of the next Business Day after [OPC's] receipt thereof."[40] For purposes of this agreement, "Net Proceeds" means any payment by a "consumer" to OPC, less certain costs incurred by OPC.[41] In addition, Section 5.1 provides that OPC shall indemnify Midland "from and against any and all losses, claims, damages, expenses (including reasonable attorneys' fees) and costs suffered or incurred (whether suit is instituted or not) as a result of, arising out of or otherwise relating in any way to[,]" among other things, OPC's breach of the Servicing Agreement, "any intentional, reckless

---

[38]     *Id.*

[39]     *Id.* § 1.3.

[40]     Servicing Agreement § 3.2.

[41]     *Id.* §§ 1.45, 1.58, 3.2.

11

or negligent acts or omissions" by OPC, or OPC's "violation of any Applicable Law in connection with its performance of this Agreement."[42]

On May 26, 2017, Midland drafted a letter[43] identifying "legal claims [against the escrow] in relation to the [Purchase Agreement]."[44] In this letter, Midland claims that PRA breached: (1) Section 2.6.1 by not forwarding funds received by PRA with respect to the purchased accounts; (2) Section 5 by not paying the "Adjustment Amount" for "Ineligible Accounts;" and (3) Sections 7.5, 7.10, 7.11, 7.13 and 7.14 by "misrepresent[ing] the character of the Purchased Accounts . . . engag[ing] in Mass Settlement activities . . . adversely select[ing] accounts to be sold . . . [and] exclud[ing] certain information relating to [PRA's] activities from [PRA's] records provided to [Midland]."[45] The letter did not contain any indemnification claim. Midland's senior vice president and general counsel gave the letter to his executive assistant to send.[46] The executive assistant then sent the letter only to the escrow

---

[42]    *Id*. § 5.1.

[43]    Pl.'s Mot. for Summ. J. & Pl. & Third-Party Def.'s Mot. to Dismiss Ex. 3.

[44]    Def.'s Answering Br. in Opp'n to Summ. J. 8.  While the claims in this letter overlap with certain of Midland's counterclaims and third-party claims, Midland only cites it in discussing whether it provided adequate notice to PRA and does not otherwise specifically discuss the claims therein in setting forth its counterclaims and third-party claims.

[45]    Pl.'s Mot. for Summ. J. & Pl. & Third-Party Def.'s Mot. to Dismiss Ex. 3.

[46]    Def.'s Answering Br. in Opp'n to Summ. J. 9.

12

agent by facsimile and Federal Express.[47] Midland never sent a copy of the letter or any other form of notice to PRA.[48] On May 30, 2017, the escrow agent informed PRA of the letter containing Midland's claims.[49] Midland concedes that the sole reason for its failure to provide notice pursuant to the Purchase Agreement and Escrow Agreement was "[h]uman error" on Midland's side.[50] On June 7, 2017, PRA asked Midland to release the escrow funds and disputed the claims set forth in Midland's letter.[51] Midland refused to release the escrow funds, and PRA filed this action.

## C. Procedural History

On June 21, 2017, PRA filed a complaint seeking the release of the escrow funds. On July 25, 2017, Midland brought counterclaims against PRA and third-party claims against OPC. The counterclaims and third-party claims allege contractual breaches, fraud, aiding and abetting fraud, negligent misrepresentation, indemnification claims, and unjust enrichment arising from the sale of the accounts. On August 11, 2017, PRA moved for summary judgment on its request to release

---

[47]     *Id*. at 9-10.

[48]     *Id*.

[49]     Oral Arg. Tr. 7.

[50]     *Id*. at 34.

[51]     Pl.'s Verified Compl. ¶¶ 36-41.

the escrow funds, and PRA and OPC moved to dismiss the counterclaims and third-party claims, respectively. On September 15, 2017, Midland amended its counterclaims and third-party claims, and PRA and OPC moved to dismiss the amended counterclaims and third-party claims, respectively, on October 4, 2017. On December 8, 2017, Midland moved for partial summary judgment seeking declaratory judgment that the escrow funds should not be released until Midland's counterclaims and third-party claims are adjudicated. On December 19, 2017, Midland moved to amend its counterclaims and third-party claims a second time. Following the completion of briefing for all four motions, the Court held oral argument on January 23, 2018.

## II. MOTION FOR SUMMARY JUDGMENT ANALYSIS

PRA moves for summary judgment and seeks the release of the escrow funds arguing that Midland failed to give proper notice of any claims against the escrow under the terms of the Purchase Agreement and Escrow Agreement.[52] Midland cross-moves for partial summary judgment on the issue of notice, arguing that PRA received actual notice of Midland's claims and that actual notice substantially complies with the requirements of the Purchase Agreement and Escrow

---

[52] Pl. & Third-Party Def.'s Br. in Support of Pl.'s Mot. for Summ. J. & Pl. & Third-Party Def.'s Mot. to Dismiss 1.

Agreement.[53]  Midland further "seek[s] a declaration that the escrow funds should remain in escrow pending the resolution of Midland's claims against [PRA and OPC]."[54]

Summary judgment will be "granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[55]  The movant bears the initial burden of demonstrating that there is no question of material fact.[56]  When the movant carries that burden, the burden shifts to the nonmoving party "to present some specific, admissible evidence that there is a genuine issue of fact for a trial."[57]  When considering a motion for summary judgment, the evidence and the inferences drawn from the evidence are to be viewed in the light most favorable to the nonmoving

---

[53]  Def.'s Answering Br. in Opp'n to Summ. J. 15.

[54]  *Id*. at 3.

[55]  *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *8 (Del. Ch. Sept. 14, 2007) (citing Ct. Ch. R. 56(c)).

[56]  *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *3 (Del. Ch. Dec. 29, 2009).

[57]  *Id.*

party.[58] Even so, the non-moving party may not rely on allegations or denials in the pleadings to create a material factual dispute.[59]

The pending motions for summary judgment require me to examine the Purchase Agreement and Escrow Agreement. "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[60] "When interpreting a contract, this Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."[61] The terms of the contract control "when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[62] Standard rules of contract interpretation state that "a court must determine the intent

---

[58]   Ct. Ch. R. 56(e); *Judah v. Del. Trust Co.*, 378 A.2d 624, 632 (Del. 1977); *Fike v. Ruger*, 754 A.2d 254, 260 (Del. Ch. 1999), *aff'd*, 752 A.2d 112 (Del. 2000).

[59]   *Fike*, 754 A.2d at 260.

[60]   *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[61]   *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (quoting *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[62]   *Id.* at 368 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

16

of the parties from the language of the contract."[63]  "In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract."[64]

The applicable provisions in the Purchase Agreement and Escrow Agreement are express and clear.  The Purchase Agreement provides that the escrow funds will be held in accordance with the Escrow Agreement.[65]  The Escrow Agreement requires the release of the escrow funds if there is no timely claim before the expiration date on May 31, 2017.[66]  To establish a timely claim, the Escrow Agreement requires that notice be sent either by a nationally recognized courier service or by certified mail to a specified PRA address, or by facsimile to a specified PRA location followed by a telephone call to confirm receipt thereof.[67]  If Midland

---

[63]     *Id.* (quoting *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003)).

[64]     *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 913-14 (Del. 2017).

[65]     Purchase Agreement § 10.

[66]     Escrow Agreement § 1.13.  Compliance with the Purchase Agreement notice provision is not relevant to whether the escrow funds should be released.  As discussed above, Midland also had to provide written notice to PRA to enforce certain provisions of the Purchase Agreement.  The Purchase Agreement notice provision requires written notice of any "Ineligible Accounts" under Section 5.1 by November 26, 2014, and written notice to enforce its indemnification rights under Section 8.2 by May 30, 2017.  Purchase Agreement §§ 5.1, 8.2.

[67]     Escrow Agreement § 4.7.

17

fails to provide notice by these methods by the expiration date, then the terms of the transaction documents negotiated by the parties dictate that the escrow funds should be released.[68]

Midland acknowledges that it did not comply with these requirements.[69] But Midland notes that the escrow agent made PRA aware of Midland's escrow claims before the expiration date.[70] Midland argues that because PRA received actual notice, case law allows the Court to ignore the terms of the notice requirements in the Escrow Agreement. Midland further argues that the actual text of the Purchase Agreement and Escrow Agreement do not require strict compliance with the notice provision. These arguments fail.

The cases upon which Midland relies to argue that actual notice reflects substantial compliance with the requisite notice provision in the Escrow Agreement are inapposite and inapplicable here. *Corporate Property Associates 6 v. Hallwood Group Inc.* concerned the validity of an agreement to prepay the principal on certain debt in exchange for a release of claims.[71] The plaintiffs argued that the agreement was invalid because the opposing party did not follow the precise terms of the notice

---

[68]    *Id.* § 1.3.

[69]    Oral Arg. Tr. 34.

[70]    Def.'s Answering Br. in Opp'n to Summ. J. 1.

[71]    792 A.2d 993 (Del. Ch. 2002), *rev'd on other grounds*, 817 A.2d 777 (Del. 2003).

provision contained in a prior settlement agreement.[72]  But this Court found that "literal compliance with th[e] [notice] provision would have been impossible" because the named individual to whom notice was directed no longer worked at the organization to which notice was due.[73]  In the instant case, Midland does not argue that compliance with the notice provision was impossible; instead, Midland admits that the cause of non-compliance was "[h]uman error."[74]

In *Kelly v. Blum*, the plaintiff contended that a merger was void for failure to comply with notice provisions in a contract, which required that certain classes of LLC interests receive notice at least five business days before a merger.[75]  This Court found that the express terms of the contract allowed for several different forms of notice, including by commercial delivery service.[76]  Thus, this Court found that the plaintiff could not complain that he received notice by commercial delivery service instead of by U.S. mail under the terms of that contract.[77]  Additionally, while the plaintiff in that case alleged that notice was not timely sent, this Court simply

---

[72]     *Id*. at 1000.

[73]     *Id*.

[74]     Oral Arg. Tr. 34.

[75]     2010 WL 629850, at *8 (Del. Ch. Feb. 24, 2010).

[76]     *Id*.

[77]     *Id*.

disagreed with the plaintiff's contention about the proper count of calendar days around a holiday, concluding that the notice met the terms of the contract regarding timing as well.[78]  In the instant case, Midland never directly gave notice to PRA in any form before the expiration date.

*HCR-Manor Care v. Fugee* involved a son who took his mother to a rehabilitation center following an injury.[79]  At the time of admission, the son "stated his intention to take his mother home at the conclusion of her therapy[.]" [80]  He executed an "Admission Agreement" with the rehabilitation center that required written notice of termination in advance of a patient's departure. [81]  In the middle of an ensuing guardianship fight with his sister, the son requested that the hospital move his mother to a new facility.[82]  The son later delivered written notice to the hospital and moved his mother.[83]  The hospital attempted to bill the son for the time between his first verbal request to move his mother and the second written request on the

---

[78]     *Id.*

[79]     2010 WL 780020, at *1 (Del. Super. Jan. 26, 2010), *recons. granted in part, denied in part*, 2010 WL 1175209 (Del. Super. Mar. 25, 2010).

[80]     *Id.*

[81]     *Id.* at *2.

[82]     *Id.*

[83]     *Id.*

grounds that the son had failed to provide written notice at the earlier date.[84] The Delaware Superior Court began its analysis by noting that the Admission Agreement was a contract of adhesion, arising from the imbalance of bargaining power.[85] The Superior Court then concluded that the son's earlier notice substantially complied with the notice requirement in the Admission Agreement.[86] But the instant case does not involve a contract of adhesion. PRA and Midland are sophisticated parties who negotiated the Purchase Agreement and Escrow Agreement at arm's length. Further, in each case to which Midland points, the party actually transmitted notice to whom it was due. Here, Midland sent notice to a third party (the escrow agent) who then informed PRA of Midland's escrow claims. Thus, I reject Midland's argument that Midland substantially complied with the notice provision in the Escrow Agreement.

Midland's argument that the contract does not call for strict compliance with its own terms also fails.[87] Midland relies on *Eurofin Panlabs, Inc. v. Ricerca Biosciences, LLC* for the proposition that failure to comply with a notice requirement should not be strictly construed. [88] But that case is inapplicable. In *Eurofin*, the

---

[84]     *Id.*

[85]     *Id.* at *5.

[86]     *Id.* at *6.

[87]     Def.'s Answering Br. in Opp'n to Summ. J. 15, 19.

[88]     2014 WL 2457515 (Del. Ch. May 30, 2014).

contract at issue "d[id] not define reasonable notice or explain how the Court should enforce a failure to comply with the provision."[89]  In the instant case, however, the Escrow Agreement specifies what constitutes notice and requires the release of the escrow funds if such notice is not provided by May 31, 2017.

Midland offers no reason other than its own error for its failure to comply with the notice provision it negotiated in the Escrow Agreement.  Thus, I grant PRA's Motion for Summary Judgment and deny Midland's Motion for Partial Summary Judgment.  I need not address Midland's request that funds not be released pending resolution of the counterclaims and third-party claims because I dismiss all those claims for the reasons discussed below.

## III.    MOTION TO DISMISS ANALYSIS

Midland asserts fraud, negligent misrepresentation, breach of contract, indemnification, and unjust enrichment counterclaims and third-party claims against PRA and OPC, respectively, regarding the accounts Midland purchased.  Midland also asserts an aiding and abetting fraud claim against OPC.  PRA and OPC move to dismiss Midland's counterclaims and third-party claims pursuant to Court of Chancery Rule 12(b)(6) and, with respect to fraud and negligent misrepresentation, Rule 9(b).

---

[89]      *Id*. at *4.

22

In considering a motion to dismiss under Rule 12(b)(6), "(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; [and] (iii) the Court must draw all reasonable inferences in favor of the non-moving party."[90] While I must draw all reasonable inferences in Midland's favor, I need not "accept as true conclusory allegations 'without specific supporting factual allegations.'"[91] "[D]ismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[92]

Court of Chancery Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," while "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally."[93] "To satisfy Rule 9(b), a complaint must allege: (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the

---

[90] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[91] *Id.* (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65-66 (Del. 1995)).

[92] *Id.* (quoting *Savor*, 812 A.2d at 896-97).

[93] Ct. Ch. R. 9(b); *Trusa v. Nepo*, 2017 WL 1379594, at *9 (Del. Ch. Apr. 13, 2017) (citing *Addy v. Piedmonte*, 2009 WL 707641, at *19 (Del. Ch. Mar. 18, 2009); *Abry P'rs V, L.P. v. F & W Acquisitions LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006)).

23

representations."[94]  "Despite these particularity requirements for the circumstances, though, state of mind and knowledge may be averred generally pursuant to Rule 9(b) because 'any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable.'"[95]

## A.    Midland's Counterclaims Against PRA

All of Midland's counterclaims against PRA relate to the purchased accounts and PRA's sale of those accounts to Midland pursuant to the Purchase Agreement. The Purchase Agreement, however, provides that Midland's "exclusive remedy" for claims arising from the Purchase Agreement or any transactions contemplated thereby "is limited to the amount held in escrow . . . pursuant to the Escrow Agreement."[96]  As discussed, the Escrow Agreement requires that Midland provide notice of any escrow claim arising from the sale in a particular manner by May 31, 2017.  The Escrow Agreement further requires the release of all escrow funds to PRA if Midland fails to give the necessary notice of the claims before that date.[97] Midland did not provide the necessary notice of its claims in time.  Thus, unless

---

[94]    *Abry P'rs*, 891 A.2d at 1050 (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003)).

[95]    *Id.* (citing *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993)).

[96]    Purchase Agreement § 10.

[97]    Escrow Agreement § 1.3.

Midland can present a reason for the Court not to enforce the terms of the Purchase Agreement, Midland cannot sustain its claims against PRA.

### 1. Midland fails to state a claim for fraud

Midland alleges several fraudulent "schemes" by PRA and OPC in connection with the sale of the purchased accounts.[98] PRA contends that it "may not be held liable for any amount beyond the funds held in escrow at the time the claim is asserted" and that "[t]o the extent the escrow is released by grant of summary judgment in PRA's favor, Midland cannot sustain any claims for damages on any grounds against PRA."[99] Midland responds that its failure to provide proper notice should not bar Midland's claims because PRA fraudulently induced Midland into agreeing to the sale.

Midland argues that the limitation of liability provision in the Purchase Agreement cannot bar Midland's claims, because this Court, in *Abry Partners V, L.P. v. F & W Acquisitions LLC* held that "to the extent that the Stock Purchase Agreement purports to limit the [s]eller's exposure for its own conscious participation in the communication of lies to the [b]uyer, it is invalid under the public

---

[98]    Def.'s Am. Countercls. & Third-Party Compl. ¶ 1. Midland does not distinguish between PRA's and OPC's actions in these "schemes"—referring to them as "PRA Defendants"—but for purposes of this discussion I will only refer to PRA because Midland's fraud claims are primarily directed at PRA.

[99]    Pl. & Third-Party Def.'s Mem. of Law in Support of Mot. to Dismiss 19.

policy of this State."[100]  That is, public policy in Delaware prohibits a seller from "insulat[ing] itself from the possibility that the sale would be rescinded if the [b]uyer can show either: 1) that the [s]eller knew that the Company's contractual representations and warranties were false; or 2) that the [s]eller itself lied to the [b]uyer about a contractual representation and warranty."[101]  To make such a showing, a buyer must "prove that the [s]eller acted with an illicit state of mind, in the sense that the [s]eller knew that the representation was false and [] communicated it to the [b]uyer."[102]  "The [b]uyer may not escape the contractual limitations on liability by attempting to show that the [s]eller acted in a reckless, grossly negligent, or negligent manner."[103]

As discussed, the limitation of liability clause provides that PRA's total liability and Midland's exclusive remedy with respect to the Purchase Agreement is limited to the amount held in escrow pursuant to the Escrow Agreement.  Thus to avoid this limit on its recovery, Midland must sufficiently allege fraud by PRA with respect to the sale.  To state a claim for fraud, a claimant must:

> [P]lead facts supporting an inference that: (1) the
> defendant falsely represented or omitted facts that the

---

[100]    891 A.2d at 1064

[101]    *Id.*

[102]    *Id.*

[103]    *Id.*

26

defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[104]

As explained above, fraud claims must be stated with particularity.

### a. The legal channel scheme

Midland alleges that PRA misrepresented the value of the purchased accounts by omitting information about its collection practices and falsely representing the performance of the purchased accounts in the "legal channel." Midland claims that PRA failed to disclose during due diligence that it had changed its "long-standing practice[] of only filing collection litigation on higher-quality accounts and began to flood the 'legal channel' with lawsuits related to lower-quality accounts."[105]

Midland alleges that this omission made various purported representations in the Offering Memorandum false. First, Midland claims that PRA provided misleading "liquidation curves" that "purported to show the rate at which the Accounts could be expected to be converted to cash."[106] Midland claims this rate

---

[104] *Id.* at 1050.

[105] Def.'s Am. Countercls. & Third-Party Compl. ¶ 7.

[106] *Id*. ¶ 3. Midland alleges that PRA also provided the "liquidation curves" under separate cover. *Id*. ¶ 8.

would have been much different if the "liquidation curves" had included that "[PRA and OPC] had [] begun suing on low-quality Accounts that they had historically avoided pursuing."[107]

Second, Midland alleges that PRA misrepresented that "there was an opportunity to create additional value by filing more collection lawsuits in the future."[108] Midland states that the following excerpts of the Offering Memorandum reflect the false statements regarding the opportunity to file more collection lawsuits:

> OPC has steadily identified and sent a growing population of accounts to the legal process . . . OPC has not pursued legal activity on almost 400,000 accounts. With an average age since charge-off of approximately 80 months (6.67 years) there is plenty of time and material to continue to build upon a robust legal stream. OPC was unable to pursue all that were deemed to be suit-worthy due to budgetary constraints – leaving opportunity to ramp up legal efforts in the short-term.
>
> ***
>
> [Liquidation rates] achieved from 2008-2012 have been relatively constant and early results on 2013 litigation appear to be tracking prior years.
>
> ***
>
> Conventional wisdom would generally assume that as the time between legal placement and the charge-off gets more distant that returns available from litigation would get progressively lower or more volatile. The data from

---

[107]     *Id.* ¶ 9.

[108]     *Id.* ¶ 33.

> OPC's performance on PR Acquisitions' accounts suggests that while there may be some modest softening in liquidation rates, accounts deemed suitworthy have relatively stable liquidation rates and consistent curves until they push towards the outer-end of Puerto Rico's [15 year] statute [of limitations].[109]

Third, Midland claims that PRA misrepresented that the purchased accounts "contained 'substantial legal opportunity.'"[110] Midland states that the following parts of the Offering Memorandum reflect the false statements regarding the substantial legal opportunity in the purchased accounts.

> With a 15-year statute of limitations, litigation can be successfully deployed over an extended period of time – even on an aging portfolio . . . Significant inventory – and time – are still available for pursuit of litigation . . . Liquidation rates through the legal process are sustainable – even with an aging portfolio . . . Liquidation rates aren't just stable based on the calendar year accounts were placed into legal, but have also been stable based on the time difference between legal assignment and charge-off . . . Low level of dismissals and fallouts – and many are curable over time.[111]

Midland alleges that the omission and the resulting misstatements in the Offering Memorandum inflated Midland's valuation of the purchased accounts because it

---

[109]    *Id.* ¶ 33 (citing Offering Memorandum 44, 46, 47).

[110]    *Id.* ¶ 5.

[111]    *Id.* ¶ 32 (citing Offering Memorandum 1).

"created the misimpression that the Accounts were of far higher-quality, and would generate far greater cash flows, than was likely in reality."[112]

Midland has stated the facts regarding the alleged misrepresentations in the Offering Memorandum with the requisite particularity under Rule 9(b). Midland alleges that it incurred $6 million in damages, and, with the Offering Memorandum, Midland "can readily identify who made what representations where and when [and] what the defendant gained, which was to induce the plaintiff to enter into the contract."[113] PRA provided the Offering Memorandum to Midland on November 18, 2013 to induce it to enter into the Purchase Agreement. The Offering Memorandum contained the purported false statements—the "liquidation curves,"

---

[112] *Id*. ¶ 1; *see also id.* ¶ 29. Midland defines "Accounts" as the totality of PRA's "charged-off credit accounts . . . related to Puerto Rican consumers[,]" as distinguished from the purchased accounts that Midland bought from PRA pursuant to the Purchase Agreement.

[113] *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC*, 2017 WL 1174438, at *4 (Del. Ch. Mar. 29, 2017) (quoting *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015)). Midland also alleges that PRA made these misrepresentations throughout the due diligence process. Midland alleges that these misrepresentations occurred during a six-month period, with the "interactions concentrated in March, April and May of 2014," in "written statements in the form of offering memoranda, emails and other deal-related documents, and oral statements during in-person and telephone conversations" and in "multiple due-diligence sessions" attended by four identified individuals "among others" at PRA and OPC's offices in Puerto Rico. Def.'s Am. Countercls. & Third-Party Compl. ¶¶ 2-3; *see also id.* ¶¶ 28-32. Midland fails to identify any reasonable limited date range that any individual made any specific misrepresentation, other than its Offering Memorandum claims. These claims lack the requisite particularity. They also fail for the same reason as the Offering Memorandum claims fail.

information about PRA's collection practices, and information about the performance of the purchased accounts—that support Midland's fraud claim. But Midland's claim still fails because Midland cannot allege that it justifiably relied on the purported misrepresentations in the Offering Memorandum.

In its Amended Counterclaims and Third-Party Complaint, Midland alleges that PRA and OPC "intentionally omitted detailed data that would have made it possible for Midland to discover that [PRA and OPC] had begun filing collection litigation on lower-quality accounts."[114] Specifically, PRA and OPC "failed to provide detailed 'back book' data (*i.e.*, detailed account-level data showing the past performance) for the [purchased accounts]."[115] Midland then alleges that had PRA given Midland "complete 'back book' data, it would have determined not only that [PRA and OPC] had begun filing a slew of collection litigation on lower-quality accounts, but that the liquidation curves provided were inaccurate."[116] Midland also states that the "back book" data would have allowed it to determine "that there was only a very limited probability that Midland would be able to increase the [purchased accounts'] value in the future by filing additional collection litigation."[117] But,

---

[114] Def.'s Am. Countercls. & Third-Party Compl. ¶ 8.

[115] *Id.*

[116] *Id.* ¶ 38.

[117] *Id.*

31

according to Midland, PRA and OPC failed to "provide the 'robust' data they promised, and, therefore left Midland in the dark about the true nature and value of the [purchased accounts]."[118]

In response to a written notice from PRA to Midland of PRA's intention to file a motion for sanctions under Court of Chancery Rule 11, however, Midland has now admitted that it indeed received the "back book" data for the purchased accounts.[119] In fact, Midland now admits that it also received the "back book" data for all the accounts marketed by PRA, not just the ones that it purchased.[120] Thus, because by its own admission Midland possessed the data that would have illuminated "the true nature and value of the [purchased accounts],"[121] Midland cannot credibly allege that it justifiably relied on the purported false statements, and Midland's fraud claim relating to this scheme fails.[122]

---

[118]    *Id.*

[119]    Def.'s Mot. to Amend ¶ 3; Oral Arg. Tr. 64-68.

[120]    Oral Arg. Tr. 64-68; Pl. & Third-Party Def.'s Mot. for Rule 11 Sanctions Ex. 6.

[121]    Def.'s Am. Countercls. & Third-Party Compl. ¶ 38.

[122]    At oral argument, Midland asserted yet another theory related to the "back book" data that does not appear in Midland's Counterclaims and Third-Party Complaint, the Amended Counterclaims and Third-Party Complaint, the proposed second amended counterclaims and third-party complaint, or any of the briefing. Midland argued that although it received the data for the marketed accounts, it did not receive the data for the non-marketed accounts. Oral Arg. Tr. 64-68. I will not consider this argument because Midland may not amend its complaint through oral argument in opposition to a fully-briefed motion to dismiss, *see Stern v. LF Capital P'rs, LLC*,

### b. The collections scheme

Midland also argues that PRA omitted material information regarding its collection practices. In particular, Midland alleges that PRA and OPC employed "various questionable (and perhaps even unlawful) collection methods, designed to give the false appearance of increased cash flows. [PRA and OPC] knew that Midland would not use such questionable methods and therefore would never be able to achieve the same cash flows as represented by [PRA and OPC]."[123] Midland further alleges that PRA and OPC failed to "disclose that their agents were not abiding by certain consumer collection laws, including the [Telephone Consumer Protection Act], which prohibits, among other things, calling consumers on their cell phones using automatic dialers."[124] Similarly, Midland contends, PRA and OPC concealed the fact that its agents "were using 'burner' cell phones (*i.e.*, cell phones that are used and then disposed so that their source cannot be traced), which enabled them to contact consumers without fear of violating laws such as the [Telephone

---

820 A.2d 1143, 1146 (Del. Ch. 2003), and "[i]ssues not briefed are deemed waived." *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (citing *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993); *Loudon v. Archer*, 700 A.2d 135, 140 (Del. 1997)). I note, however, that PRA filed a motion for sanctions under Court of Chancery Rule 11 in which it alleges that Midland did in fact have the "back book" data for *all* of PRA's accounts.

[123]   Def.'s Am. Countercls. & Third-Party Compl. ¶ 58.

[124]   *Id.* ¶ 40; *see also id.* ¶ 10.

Consumer Protection Act] regulating the permissible timing and frequency of contact with consumers."[125] Midland argues that these methods generated "the perception during due diligence that the cash flows being generated by the [purchased accounts] were far higher than they actually were."[126]

Although unclear, Midland seems to allege that the "cash flows being generated" were unsustainable because PRA used "questionable (and perhaps even unlawful) collection methods" that Midland would not use.[127] But Midland does not allege that PRA had an affirmative duty to disclose "questionable" collection practices.[128] Likewise, Midland does not allege that PRA lied about any "questionable" collection practices.[129] Further, although Midland alleges that PRA represented in the Offering Memorandum that it had a "[l]ong-term track record of

---

[125] *Id.* ¶ 40.

[126] *Id.*

[127] *Id.* ¶ 58.

[128] *Trusa*, 2017 WL 1379594, at *10 ("In an arm's length negotiation, where no special relationship between the parties exists, 'a party has no affirmative duty to speak' and 'is under no duty to disclose facts of which he knows the other is ignorant even if he further knows the other, if he knew of them, would regard them as material in determining his course of action in the transaction in question.' Thus, 'any claim of fraud in an arms' length setting necessarily depends on some form of representation,' and '[a] fraud claim in that setting cannot start from an omission.'") (quoting *Prairie Capital III, L.P.*, 132 A.3d at 52).

[129] *Id.* ("But, if a party 'chooses to speak then it cannot lie,' and 'once the party speaks, it also cannot do so partially or obliquely such that what the party conveys becomes misleading.'") (quoting *Prairie Capital III, L.P.*, 132 A.3d at 52).

regulatory compliance[,]"[130] Midland fails to adequately allege that PRA used

"illegal" or "unlawful" collection methods.  Simply providing examples of illegal

conduct, without actually stating that PRA engaged in that illegal conduct, fails to

state a claim.[131]  Likewise, pointing to conduct that Midland disapproves of, but that

is not illegal, also fails to state a claim.  Such a lack of any facts regarding the

purported fraud fails to apprise PRA and OPC of sufficient information concerning

the circumstances of the alleged fraud and, thus, does not satisfy the particularity

requirement of Rule 9(b).

## 2. Midland fails to state a claim for negligent misrepresentation

Midland also alleges negligent misrepresentation claims.  But Midland "may

not escape the contractual limitations on liability by attempting to show that [PRA]

acted in a reckless, grossly negligent, or negligent manner."[132]  Even assuming the

---

[130]   Def.'s Am. Countercls. & Third-Party Compl. ¶ 34.

[131]   *Id.* ¶¶ 10, 40, 58.  *See Spring Real Estate, LLC v. Echo/RT Hldgs., LLC*, 2013 WL 6916277, at *7 (Del. Ch. Dec. 31, 2013) ("The Complaint does not state a claim . . . because the[] allegations are conclusory and mere recitations of the . . . statute."); *Hospitalists of Del., LLC v. Lutz*, 2012 WL 3679219, at *13 (Del. Ch. Aug. 28, 2012) ("In the circumstances of this case, even under Delaware's minimal notice pleading standard, simply reciting the statutory or common law elements of [a fraudulent transfer], as Plaintiffs have here, is insufficient to state a claim upon which relief may be granted.").

[132]   *Abry P'rs*, 891 A.2d at 1064.

35

limitation of liability clause in the Purchase Agreement does not preclude Midland's negligent misrepresentation claim, Midland's claim still fails.

To plead negligent misrepresentation, Midland must allege that "(1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information."[133] "A claim of negligent misrepresentation, or equitable fraud, requires proof of all the elements of common law fraud except that plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly."[134] A negligent misrepresentation claim must be stated with the same particularly required for fraud.[135] For all the reasons stated above, Midland fails to (1) adequately allege that

---

[133] *Steinman v. Levine*, 2002 WL 31761252, at *15 (Del. Ch. Nov. 27, 2002), *aff'd*, 822 A.2d 397 (Del. 2003).

[134] *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *9 (Del. Ch. Jan. 30, 2015) (citing *Williams v. White Oak Builders, Inc.*, 2006 WL 1668348, at *7 (Del. Ch. June 6, 2006)) (internal quotation marks omitted).

[135] *Id.* at *9 n.57 ("*See Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *7 (Del. Ch. Apr. 30, 2014) (applying Rule 9(b) pleading standard to equitable fraud claim); *see also Those Certain Underwriters at Lloyd's London v. National Installment Ins. Svcs.*, 2007 WL 1207106, at *5 (Del. Ch. Feb. 8, 2007) ('Court of Chancery Rule 9(b) requires that fraud be pled with particularity. This rule almost certainly extends to negligent misrepresentation (equitable fraud) as well.') (citing *In re Dataproducts Corp. S'holders Litig*, 1991 WL 165301 (Del. Ch. Aug. 22, 1991), reprinted at 17 Del. J. Corp. L. 1159, 1170 [n.5]).").

it justifiably relied on the supposed false information in the Offering Memorandum and (2) allege with the requisite particularity that PRA omitted material information regarding its collection practices. Thus, for the same reasons its fraud claim fails, Midland's negligent misrepresentation claim also fails.

### 3. Midland fails to state a claim for breach of contract

Midland asserts breach of contract claims against PRA for breaching the following provisions of the Purchase Agreement in the following ways: (1) Section 5 by failing to repurchase certain "Ineligible Accounts;" (2) Section 2.6.1 by failing to remit certain funds received by creditors; and (3) Sections 7.5, 7.12, 7.13 and 7.14 by misrepresenting the accuracy of the diligence provided and the character of the purchased accounts.[136]

Section 5.1 required Midland to provide written notice and documentary evidence of the "Ineligible Accounts" by November 26, 2014 to trigger PRA's obligation to repurchase the "Ineligible Accounts."[137] Midland does not argue that it sent anything to PRA by November 26, 2014. Further, even though Midland stated repurchase claims in its May 26, 2017 letter to the escrow agent,[138] Midland does not argue that that letter attached the documentary evidence required by Section 5.1

---

[136]    Def.'s Am. Countercls. & Third-Party Compl. ¶¶ 71-92.

[137]    Purchase Agreement §§ 5.1-5.2.

[138]    Pl.'s Mot. for Summ. J. & Pl. & Third-Party Def.'s Mot. to Dismiss Ex. 3.

or that it has otherwise provided that evidence. As a result, Midland's claims under Section 5 are untimely.

The limitation of liability clause in the Purchase Agreement provides that Midland's "exclusive remedy" for claims arising from the Purchase Agreement or any transactions contemplated thereby "is limited to the amount held in escrow . . . pursuant to the Escrow Agreement."[139] This requires that claims related to the remittance of payments under Section 2.6.1 and representations made in Section 7 had to be raised in a particular manner by May 31, 2017 per the Escrow Agreement notice provision. As discussed, Midland's escrow claims were not timely. Thus, Midland cannot sustain its breach of contract claims against PRA.

### 4. Midland fails to state a claim for indemnification

Midland asserts a separate claim for indemnification under Section 8.2 of the Purchase Agreement.[140] But this claim is untimely. As the Purchase Agreement makes clear: "The obligations of [PRA] under this Section 8.2 shall survive until the third anniversary of the Closing Date."[141] In other words, any obligation for PRA to indemnify Midland expired on May 30, 2017. Midland did not seek indemnification from PRA by that date. Thus, Midland's indemnification claim also fails.

---

[139]    Purchase Agreement § 10.

[140]    Def.'s Am. Countercls. & Third-Party Compl. ¶¶ 93-97.

[141]    Purchase Agreement § 8.2.

### 5. Midland fails to state a claim for unjust enrichment

Midland asserts an unjust enrichment claim against PRA for "(1) causing Midland to overpay for the [purchased accounts], (2) failing to remit funds related to Putback/Buyback Claims, and/or (3) failing to remit the Bankruptcy Payments."[142] "Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[143] To assert a claim for unjust enrichment, a plaintiff must prove the following elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.'"[144] But the Court "must first determine 'whether a contract already [comprehensively]

---

[142] Def.'s Am. Countercls. & Third-Party Compl. ¶ 99. The terms "Putback/Buyback Claims" and "Bankruptcy Payments" are not defined or otherwise used in the Purchase Agreement. Midland states that PRA's failure to remit the funds associated with these terms is a breach of Section 2.6.1 of the Purchase Agreement. *Id.* ¶ 81, 89. Midland also suggests that the "Putback/Buyback Claims" relate to repurchases of "Ineligible Accounts" purportedly due under of the Purchase Agreement. *Id.* ¶ 49. For purposes of this discussion, I treat "Bankruptcy Payments" as creditor payments due to Midland by operation of Section 2.6.1, and "Putback/Buyback Claims" as creditor or repurchase payments due under Sections 2.6.1 or 5.

[143] *RCS Creditor Tr. v. Schorsch*, 2018 WL 1640169, at *7 (Del. Ch. Apr. 5, 2018) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).

[144] *Id.*

governs the relevant relationship between the parties.'"[145] If so, "then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied."[146] If, however, the contract itself is the unjust enrichment, then "the existence of the contract does not bar the unjust enrichment claim."[147] "In other words, '[t]he contract itself is not necessarily the measure of [the] plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (such as breach of fiduciary duty or fraud) or mistake and the [defendant] has been unjustly enriched by the benefits flowing from the contract.'"[148]

PRA argues that Midland's unjust enrichment claim must be dismissed because the conduct at issue is governed by the Purchase Agreement.[149] Midland's claim that PRA "caus[ed] Midland to overpay for the Portfolio"[150] appears related to Midland's fraud claim. The Purchase Agreement cannot be the measure of Midland's right where Midland claims that PRA secured the Purchase Agreement

---

[145]    *Id.* (quoting *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009)).

[146]    *Id.*

[147]    *Id.*

[148]    *Id.* (citing Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.01[b] (2016)).

[149]    Pl. & Third-Party Def.'s Mem. of Law in Support of Mot. to Dismiss 32.

[150]    Def.'s Am. Countercls. & Third-Party Compl. ¶ 99.

through fraud.[151] But, for the reasons discussed above, Midland's counterclaims fail to adequately state a claim for fraud. Midland's allegations that PRA failed to remit "Bankruptcy Payments" and funds related to "Putback/Buyback Claims" are sufficiently covered by the Purchase Agreement in Sections 2.6.1 and 5, and they are duplicative of Midland's breach of contract claims with respect to those sections. Thus, because Midland fails to sufficiently plead fraud and the Purchase Agreement "comprehensively governs the parties' relationship"[152] with respect to the purported non-remittances and repurchases, Midland's unjust enrichment claim fails.

## B. Midland's Third-Party Claims Against OPC

Midland asserts the following third-party claims against OPC: (1) fraud, (2) negligent misrepresentation, (3) aiding and abetting fraud, (4) breach of contract, (5) indemnification, and (6) unjust enrichment.

First, Midland's fraud and negligent misrepresentation claims fail. Midland lumps PRA and OPC together in its fraud and negligent misrepresentation claims and does not identify any specific acts by OPC to further the purported fraudulent schemes. Thus, for all the reasons stated above in my analysis of the fraud and negligent misrepresentation claims against PRA, Midland's fraud and negligent misrepresentation claims against OPC fail.

---

[151] *RCS Creditor Tr.*, 2018 WL 1640169, at *7.

[152] *Id.* (citing *BAE Sys. Info. & Elec. Sys. Integration, Inc.*, 2009 WL 264088, at *7).

41

Next, Midland's aiding and abetting fraud claim also fails. The elements of aiding and abetting fraud are "(i) underlying tortious conduct, (ii) knowledge, and (iii) substantial assistance."[153] Because the underlying tortious conduct claim fails, Midland's aiding and abetting claim against OPC also fails.

As discussed more fully above, Midland alleges that OPC and PRA breached the Purchase Agreement by failing to remit certain funds, not repurchasing certain purchased accounts, and misrepresenting the accuracy of the diligence provided and the character of the purchased accounts. OPC, however, is not a party to the Purchase Agreement. Midland acknowledges this fact, but it nonetheless argues that OPC should be liable because PRA and OPC "act[ed] in disregard of their corporate form."[154] Thus, Midland seems to argue that this Court should pierce the corporate veil and hold OPC liable for PRA's actions. "Persuading a Delaware court to disregard the corporate entity is a difficult task."[155] To assert a claim to pierce the corporate veil, Midland must allege facts that, if taken as true, demonstrate PRA's

---

[153]     *Trusa*, 2017 WL 1379594, at *12 (citing *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *22 (Del. Ch. Nov. 26, 2014)).

[154]     Def.'s Answering Br. in Opp'n to Mot. to Dismiss 42 n.13.

[155]     *Wallace ex rel. Cencom Cable Income P'rs II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) (citing *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537, at*4 (Sept. 19, 1989)).

"complete domination and control" of OPC.[156] "The degree of control required to pierce the veil is 'exclusive domination and control . . . to the point that [OPC] no longer ha[s] legal or independent significance of [its] own.'"[157] Piercing the corporate veil under the alter ego theory requires showing that the corporation is "a sham and exist[s] for no other purpose than as a vehicle for fraud."[158]

Midland argues that PRA and OPC "have affirmatively provided sworn facts that suggest that they act in disregard of their corporate form."[159] The only "facts" that Midland identifies are that: (1) "in the context of their Motion to Expedite, PRA claimed it needed the immediate release of the Escrow Funds to benefit other companies owned by the principals of PRA (a limited liability company), Rodolfo Sanchez-Colberg and Nicolas Kogan[;]" and (2) "in the context of PRA's Motion for Summary Judgment, PRA submitted the Affidavit of Monica B. Romero, who testified that she is Corporate Legal Counsel employed with Americas Leading Finance, LLC (an entity owned by Mr. Kogan), yet was tasked with attempting to

---

[156] *Id*. at 1183-84.

[157] *Id*. at 1184 (citing *Hart Hldg. Co. v. Drexel Burnham Lambert, Inc.*, 1992 WL 127567, at *11 (Del. Ch. May 28, 1992)).

[158] *Id*.

[159] Def.'s Answering Br. in Opp'n to Mot. to Dismiss 42 n.13.

43

collect the Escrow Funds on behalf of PRA."[160]  These facts do not suggest in any way that PRA dominates or controls OPC or that OPC exists as a vehicle for PRA's purported fraud.  Thus, Midland's claims for breach of the Purchase Agreement fail because OPC is not party to that agreement, and Midland's allegations do not support a reasonably conceivable claim for piercing the corporate veil.[161]

Next, Midland attempts to plead breach of contract claims relating to the Servicing Agreement.  Midland argues that OPC breached Section 3.2 of the Servicing Agreement by failing to remit "received proceeds 'by the end of the next Business Day' after receipt."[162]  This is the extent of Midland's allegations with respect to OPC's purported breach of the Servicing Agreement.  Midland fails to allege any facts whatsoever about the proceeds supposedly withheld by OPC.  In fact, Midland actually lumps this purported breach in with alleged breaches by PRA

---

[160]    *Id.*

[161]    *See Kleinberg v. Aharon*, 2017 WL 4444216, at *4 (Del. Ch. Oct. 4, 2017) (ORDER).

[162]    Def.'s Am. Countercls. & Third-Party Compl. ¶¶ 82, 90 (*quoting* Servicing Agreement § 3.2).  Midland is not a party to the Servicing Agreement, but it is a designated third-party beneficiary.  Servicing Agreement § 6.9.

and OPC of the Purchase Agreement.[163] Thus, Midland fails to state a claim for breach of the Servicing Agreement by OPC. [164]

Midland also alleges an indemnification claim against OPC under Section 5.1 of the Servicing Agreement.[165] That section requires that OPC indemnify Midland "from and against any and all losses, claims, damages, expenses (including reasonable attorneys' fees) and costs suffered or incurred (whether suit is instituted or not) as a result of, arising out of or otherwise relating in any way to," among other things, OPC's breach of the Servicing Agreement, "any intentional, reckless or negligent acts or omissions" by OPC, or OPC's "violation of any Applicable Law."[166] Midland asserts no allegations whatsoever that OPC specifically violated any "Applicable Law," committed any "intentional, reckless or negligent acts or

---

[163] Specifically, Midland alleges, in the same counts it discusses PRA's purported breach of Sections 2.6.1 and 5.1 of the Purchase Agreement, that "[a]s a direct and proximate result of [PRA and OPC's] breaches, Midland has suffered or will suffer actual damages in an amount to be determined at trial but not less than" $300,000 for "Breach of Contract (With Respect To Putback/Buyback Claims)" and $50,000 for "Breach of Contract (With Respect to Bankruptcy Payments)." Def.'s Am. Countercls. & Third-Party Compl. ¶¶ 84, 92.

[164] *See Hospitalists of Del., LLC*, 2012 WL 3679219, at *15 ("[E]ven under Delaware's minimal notice pleading standard, simply reciting the statutory or common law elements of an offense, as Plaintiff has here, is insufficient to state a claim upon which relief may be granted.").

[165] Def.'s Am. Countercls. & Third-Party Compl. ¶¶ 93-97.

[166] Servicing Agreement § 5.1.

omissions," or breached the Servicing Agreement. [167]    Thus, Midland's indemnification claim also fails.

Finally, Midland's unjust enrichment claim against OPC also fails.  Midland does not adequately state a claim for fraud against OPC, and Midland's non-remittance claims are covered by the Servicing Agreement and duplicative of its failed breach of contract claims.[168]  Thus, I grant the Motion to Dismiss the third-party claims against OPC.

## IV.    MOTION TO AMEND ANALYSIS

Midland moves to amend its counterclaims and third-party claims under Court of Chancery Rule 15(a), which states that leave to amend "shall be freely given when justice so requires."[169]  "A court will not grant a motion to amend, however, if the amendment would be futile."[170]  "In exercising its discretion, the court also considers

---

[167]   *Id*. Even if the Court assumes that the collections practices allegations in Section III.A.1.b. are stated specifically against OPC, they fail for the reasons stated.

[168]   The Servicing Agreement does not require OPC to repurchase ineligible accounts.

[169]   Ct. Ch. R. 15(a).  Midland withdrew its original counterclaims and third-party claims that were filed on July 25, 2017 and amended and substituted those counterclaims and third-party claims on September 15, 2017.

[170]   *Cartanza v. Lebeau*, 2006 WL 903541, at *2 (Del. Ch. Apr. 3, 2006) (citing *Zimmerman v. Braddock*, 2005 WL 2266566, at *6 (Del. Ch. Sept. 8, 2005), *rev'd on other grounds*, 906 A.2d 776 (Del. 2006)).

factors such as bad faith, undue delay, dilatory motive, repeated failures to cure by prior amendment, undue prejudice, and futility of amendment."[171]

Midland seeks to amend four areas of its counterclaims and third-party claims. First, Midland attempts to clarify that, while it alleged that PRA and OPC did not provide "back book" data for accounts that Midland did not purchase, Midland did receive such data for the purchased accounts.[172] Second, Midland wants to clarify that Midland personnel observed PRA and OPC employees using cellphones on a call center floor, and that those calls allegedly were "not monitored/recorded by the call center."[173] Third, Midland seeks to remove language in its counterclaims and third-party claims indicating that PRA requested that OPC remain an account servicer following the sale.[174] Fourth, Midland wants to state that it gave notice to the escrow agent of its claims against the escrow and did not merely "send notice."[175] PRA and OPC contend that Midland's "third rewrite of its countercharges against PRA and OPC" should be denied because Midland's amendments are futile.[176]

---

[171] *NACCO Indus., Inc. v. Applica Inc.*, 2008 WL 2082145, at *1 (Del. Ch. May 7, 2008).

[172] Def.'s Mot. to Amend ¶ 3.

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] Pl. & Third-Party Def.'s Opp'n to Mot. to Amend 1 (emphasis omitted).

47

All of Midland's amendments are futile.  First, as discussed more fully above, Midland's correction that it *did* receive "back book" data of the purchased accounts strengthens my fraud analysis above because it shows that Midland had access to data underlying the relevant portions of the Offering Memorandum, which Midland could have used to discern the purported fraudulent schemes in the Offering Memorandum.   Second, Midland's clarification that PRA employees used cellphones at the call center that were not monitored, like its allegation that PRA used "burner" cellphones, fails to sufficiently allege that PRA or OPC changed its collection practices in an illegal way and failed to disclose the same to Midland, even in view of the other facts plead by Midland.  Third, Midland's proposed removal of its claim that PRA requested that OPC remain servicer of the purchased accounts is irrelevant to my analysis.  Even if PRA had made such a request, my analysis of Midland's third-party claims would not change because OPC is only party to the Servicing Agreement, Midland does not state a claim to pierce the corporate veil, and Midland fails to identify any actions by OPC in its counterclaims and third-party claims, except that OPC serviced the purchased accounts.  Fourth, Midland's clarifications that it specifically sent notice to the escrow agent, and not to PRA, merely reinforces Midland's failure to provide proper notice under the Escrow Agreement.  Thus, these amendments do not change my above analyses of

48

the Motion for Summary Judgment, the Motion for Partial Summary Judgment, or the Motion to Dismiss, and the Motion to Amend is denied as futile.

## V.   CONCLUSION

For the reasons stated above, I grant PRA's Motion for Summary Judgment and order release of the $6 million from the escrow fund, deny Midland's Motion for Partial Summary Judgment, grant PRA and OPC's Motion to Dismiss Midland's counterclaims and third-party claims, and deny Midland's Motion to Amend.

**IT IS SO ORDERED**.